Good morning. Tracy Dressner for Petitioner David Chavez. I'm going to start with the easiest issue, which is the insufficiency of the evidence that Mr. Chavez aided and abetted the murder of Estella and Cullen, the two people that were in the room initially. And we have to start with some basic facts that the jury's verdict tells us, which is that the jury believed that they were going there to get the property of Watson since they acquitted Mr. Chavez of both robbery and burglary. And, two, that the jury knew that Mr. Chavez and Cantu, the shooter, and Watson had been at the house earlier that day and had been rebuffed in their efforts to get Watson's property. So, therefore, when they went back that evening to get the property, there was some anticipation that there might be some resistance to their getting it. And what we know is that they entered the house. They knocked on the door. They weren't let in. Somebody broke into the house. They went into the house. And at some point, Mr. Chavez sees that Cantu has Estella, the woman that was holding her in the room at gunpoint. And at that point, and there's – we know that there was a second person in the room. The evidence isn't clear how much Chavez knew that there was a second person in the room, but he clearly knew that Estella was in there and she was being slapped. And that is all – Well, all of that, though, too, let me just – in terms of we – we know that from the way that you're saying that because that's what your client says. Now, I mean, but also, too, we have to look at the evidence and give all inferences in favor of the verdict. And so what I'm saying is, yes, that's what your client says, but why couldn't the jury have – I mean, the jury could have also believed that he knew before they went in that he had a gun because there was a forcible, you know – Well – It's possible that you could also infer that he knew before. We – you – anything's possible, but – I mean, as for execution, murders. It has – it has to be based on something, though. It can't just be that we surmise that he must have known because he must have known. We do know from the – Well, he did have a gun. Someone did have a gun. They forcibly entered that and – and they're executed. But the evidence in trial was clear that Mr. Chavez did not know about the gun. The only evidence that came in about the gun was Watson's grandfather, who testified that Chavez showed – that Cantu showed the gun to Watson and to the grandfather, and Mr. Chavez wasn't present. So there's no evidence on the record that one could even reasonably infer that Mr. Chavez knew that anyone had a gun. Couldn't he form the – couldn't the jury have concluded that he formed all the requisite intent from the time he first saw the gun on? He – that possibly – possibly could be argued as to Soto, the third man who was brought in the room. But at the time that Mr. Chavez became aware that there was a gun, the crime of assaulting the two people with the gun had already – had already taken place, he – he can't bootstrap later knowledge into saying, well, then he somehow aided and abetted something he didn't know about until after it happened. Well, one of the theories that was urged by the appellate state court, I think, was that by rounding up the – the outlier, Mr. Soto, he actually assisted in controlling all three, because I think that was the theory that was offered by the state court. And what's your response to that? It is. It was. And I think, again, that's still conjecture. I mean, first of all, we know that there was a fourth occupant in the house. There was a man who came out who actually was the person who contacted the police. So, again, we can only surmise that that was what they were thinking. But what – but we don't know that, nor do we know that the jury would have assumed that – let's see, it's certainly reasonably plausible that, albeit not the way most people would behave, that they were holding the three people at gunpoint in the room to secure them so that they could get Watson's property and get out of there unbothered. Reasonable inference based on what we know. The jury actually was never told that they had to determine whether aiding and abetting assault with a firearm, the keeping them in the room, was a natural – that murder was a natural and probable consequence of that because there was an instructional error. In fact, what the jury was told was if they – if you think that they were aiding and abetting a murder, then there was a murder. It was a misstatement. But the fact remains that it's a big leap to conclude that Mr. Chavez seeing Cantu holding two people at gunpoint would have known that he intended to kill them and that he would have then joined that intent and, by – by pushing Mr. Soto into the room, would have then encapsulated that intent to include all three people that were in the room. Kagan. It's a great jury argument, but when you're going to sufficiency of the evidence, it's a different standard. But the sufficiency of the evidence, as this Court said repeatedly in the 1H case, there has to be some basis for it. It can't just be conjecture and surmise. I think the case – I will acknowledge the case is closer with Soto, but with the two people who were already in the room being held at gunpoint before there was ever any evidence from which anyone could infer, reasonably infer, that Mr. Soto knew that – that Mr. Chavez knew that there was a gun. Since you have limited time here, I do have a question that I would like you to address, and that has to do with you seem to be making a freestanding factual innocence claim, and I'd like you to restate that claim based on Cantu's testimony at Watson's trial. The – well, let me acknowledge one thing in the counsel for respondent and I were talking beforehand. I acknowledge that in my reply brief I cited Osborne and the United States Supreme Court has since reversed Osborne. And I acknowledge that there's some question of whether a freestanding innocence claim would actually – habeas really lies for it, although it would be astounding if it didn't. But nevertheless, the state of that is unclear. What Cantu's evidence shows, especially with the other two – with the other – what was going on with the original two people, is that we now know, based on Cantu's testimony, that he had his own motive unknown to anyone else for what he was doing that night. He knew that there were guns in that house, and he knew that the people in that house had threatened both he and Watson with violence, and that Cantu wasn't – that Mr. Chavez was not privy to that. And so to the extent that there were these questions about what might have been known beforehand, I think Cantu's testimony resolves that. And I believe that if Cantu's evidence had been presented to Mr. Chavez's jury, there's no question that they would have acquitted him at least of the murders of Estella and McCullen. Do you have anything to say about the other theory, the theory that it was – he was aiding and abetting the assault and that reasonably foreseeable consequence of that was the murder? Well, again, I'm not – it's – to determine a natural and probable consequence is case-specific. So you can't just say in the abstract every time you have an assault with a firearm it's a natural and probable consequence that you're going to commit a murder. So the question is, the jury should have had to resolve whether Mr. Chavez seeing the people being held at gunpoint would have been able to intuit from that, that Mr. – that Cantu intended to shoot them, intended to kill them. And in fact, what the evidence shows is he sees them at gunpoint, and what does he do? He goes back out and he starts looking for the property. Indeed, at the same time that – that Cantu is holding those people at gunpoint, you hear Watson on the 911 call saying, where's my stuff, where's my stuff? The agenda is still get her stuff. There's nothing to indicate that he's going to suddenly shoot everybody in the head. And the court of appeal, the State court of appeal says something about, well, you know, we shot it in the head at close range, indicating premeditation and deliberation. So what? What does that have to do with Mr. Chavez? Mr. Chavez was not present in the room during the shooting. How is he to know, and how on this record can we reasonably infer, and not just conjecture and surmise, that Mr. Chavez would have known that that was exactly what Cantu was going to do at the time he saw them holding them? And I'll reserve my last 45 seconds unless there's further questions. Thank you. Your Honor, Erica Hiramatsu on behalf of the people. First, as counsel did point out, I wanted to point out that Osborne was reversed in June by the U.S. Supreme Court, and it found that it's still an open question whether there's a federal right to bring a claim of actual innocence, to, I'm sorry, to be released upon a showing of actual innocence. Regarding Cantu's motive, whether there was a separate motive that compelled him to come with this gun, there really isn't a requirement that the two perpetrators share the same motive. And in this case, what we had was you have a theory of either direct aiding and abetting or the natural and probable consequences of the assault with a deadly weapon. Was the jury instructed on the natural and probable consequences? Yes. And there was an instructional error as to the first line of that instruction, which was in giving the instruction, they said the court said that the jury would have to find the crime of murder was committed rather than the crime of murder was committed rather than the crime of assault with a deadly weapon or assault with a firearm was committed. But as the State court and the district court also found, when you get to number four of that instruction, it's inherent that the jury had to find assault with a firearm because number four is that the crime of murder was natural and probable consequence of the commission of the crime of assault with a firearm. So they would have had to find that crime occurred. So if you're looking at the natural and probable consequences doctrine, which is, of course, the stronger case, you see that this intent is not merely to get stuff, to get the stuff back. It's also they have a shared intent of controlling the occupants in this home so that they're not going to pose an obstacle. And, in fact, we have Chavez present at the first contact with Estella where there's this very heated argument and they're turned away. Certainly after that kind of an argument, they're not going to expect that when they return, they can just walk in, knock on the door, walk in, and it'll be all okay. In fact, there was evidence that Estella was so frightened after that confrontation that she had all the lights off, she was talking to her friends, she was afraid to let her friends in. So there's some definitely reasonable inferences that the jury could have taken from that, that there was a threat. Now, why do you think that there's a weaker case on Aiding and Abetting? I wouldn't – I would say that when you're comparing the two and the amount of evidence that you have, certainly as far as the assault, and just to address this one point, the assault didn't end. It wasn't an act that had completed by the time Chavez came in. It was an ongoing crime. It was an ongoing assault because when Chavez came in, they were still being threatened by that gun. So certainly it's the stronger when you look at all the evidence that was presented to the jury. Well, but correct me if I'm wrong. There was evidence that he brought in someone in – he, by his own admission, admitted that he pushed someone in there, brought him in. Inside there, there's someone held at gunpoint. Yes. And in fact, he ordered that person, or at least acknowledged the possibility that he ordered that person to get down on the ground when in front of him was Estella on her knees with a gun to her head. So certainly that was evidence that the jury could have, you know, put to the jury and concluded there was a shared intent, at least for the direct aiding and abetting case. But certainly it would be a stronger case for assault with a deadly weapon because that was an ongoing crime against the two who were already in there. And when they – when Chavez brought in – he had testified that the first shot came after he left the room. So in that sense, Cantu's testimony would have contradicted his. And in fact, it would be worse for him because under Cantu's testimony, the first shot occurred before Chavez came in the room with Soto. Chavez – or Cantu had said that the sound of Chavez coming in startled him and caused the gun to fire. So at that point, not only would Chavez have known that Cantu had a gun, but now he knows that it has live ammunition and that he's fired. Well, wasn't – there was testimony at some point about that two people looked to be sort of in the fetal position and then that – but he said he just thought they weren't moving. Right. Wasn't there – isn't there an inference that they could have already been dead or what's – There is an inference that they – at least that's – Well, what was that? What was the actual evidence at trial? The evidence – well, there was Chavez's statement that he had heard a first shot and he came back down to look. And at that point, he saw the people in the fetal position, but he didn't see any that they were dead. And he went back up again and he heard more shots. That was a statement that Chavez had made. But we also know that regardless whether – So was it undisputed that when he entered the room with the witness that he heard it in, that everyone was alive at that point? Is that undisputed? If you could repeat that, is it – Was it undisputed that when – on the theory of aiding and abetting, is that he brought this witness in and pushed him and there's testimony to the effect that may have asked to tell the person to get on the ground. Is it undisputed that everyone was alive at that point? In the trial case, yes. The evidence presented at trial was that everybody was alive at that time. In – if you look at Cantu's testimony, which, again, we feel that that's not an argument that can be brought before this Court at this time, but if you look at – Well, on the sufficiency, we have to evaluate the evidence that was in the trial. Right. Then strictly viewing a trial, yes, everybody was alive at the time Cantu – or at the time Chavez brought in Mr. Soto. They were all alive. There was no testimony otherwise. And my final point was that regardless whether they knew – Chavez knew that Cantu had the gun at the beginning when they first arrived at the house, it's undisputed that Chavez knew Cantu had the gun and he was already – he had assaulted Estella with the gun before Chavez directed or pushed Soto into the room. Counsel for the petitioner made the comment that because Mr. Chavez was acquitted of burglary and robbery that we – from that we know certain things. Do you agree with that assessment? I do not agree as far as the charges that he was convicted of. The question was whether he aided and abetted this assault. That led to the natural probable consequence of murder or whether he aided and abetted the murder. And in this case, he's saying that he was there to assist with getting the stuff back. Whether he was going to do that violently or peacefully, that was a question for the jury and the jury found he did it violently. There are no other questions. Thank you, counsel. We have some time left. Not much. No, just a couple quick things. Yes, I agree that it was undisputed that everyone was alive when he put Soto in the room and that evidence really only came from Mr. Chavez's statements to the police because nobody else was – we don't have any evidence from anybody else. As to Cantu's testimony and the shot, he actually supports Mr. Chavez's testimony that Mr. Chavez heard the shot, he looked, he saw no blood, he thought everything was okay. And, in fact, what Mr. Cantu says was it was an accidental shot that went into the wall. So the shot that didn't hit anybody and didn't cause any blood is no indication that there's now – that he's now going to put a gun to somebody's head and shoot them. And by that same argument, controlling people with a gun is not the same as murdering them or even showing an intent to murder them. But, counsel, the problem that I have with your arguments is we really have to focus on the question of whether the State court, last recent decision of the State court, was objectively unreasonable or contrary to the standards of Jackson. And that's a point you haven't really directly addressed. Well, I – You're talking evidence. No, on the Jackson claim, but how did the State court get it wrong?  The State court is not the only one. And I really only concluded it by saying – by concluding that because he saw them in the room, he had to have known his intent. That's all the – that's all the court of appeals says. And my argument is that that is not a reasonable inference. That's merely conjecture. And that's not sufficient evidence. And so my whole argument, to the extent I'm relying on the evidence to argue that, it's all to show that their conclusion, hey, maybe you could have, but maybe you couldn't have, but that's not the standard. The standard has to be proof beyond a reasonable doubt. It can't just be, well, gee, yes, maybe he might have inferred that from there. Well, you know what? That's not really reasonable given the circumstances of what was known at that time. They were there to get the property, and there's no indication up until the time he fired the shots in their head that he was going to murder people to get that property back. He was going to control people so they could get the property without the problem that they had initially, but not that somebody would have reasonably inferred that there was going to be three murders because of that. All right. Thank you, counsel. Thank you. Chavez v. Sisto will be submitted. The next case, Deere v. California Superior Court of Riverside County, is submitted.
judges: Canby, Wardlaw, Callahan